PEOPLE ex rel. HUNTINGTON v. WALDO, Police Com'r.

(Supreme Court, Appellate Division, First Department. December 31, 1913.)

MUNICIPAL CORPORATIONS (§ 185*)—SUSPENSION AND REMOVAL OF POLICEMEN —WEIGHT AND SUFFICIENCY OF EVIDENCE.

On the trial before the police commissioner of a patrolman charged with aiding in swindling the prosecuting witness, evidence *held* to show. by the overwhelming preponderance thereof, that if, as claimed, a person dressed in a police uniform participated in the transaction by which the witness' money was obtained from him, accused was not such person.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 492–509; Dec. Dig. § 185.*]

Original certiorari proceeding by the People, on relation of Reuben R. Huntington, against Rhinelander Waldo as Police Commissioner of the Police Department of the City of New York, to review his determination in dismissing the relator, a patrolman, from such police department. Writ sustained, proceedings annulled, and relator reinstated.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

William E. Murphy, of New York City, for relator.
Harry Crone, of New York City, for respondent.

DOWLING, J. The relator had been a member of the police department in the city of New York for nearly 20 years, when he was placed on trial on a charge of having, on May 14, 1911, at about 3:30 p. m., entered the—

"apartment on the third floor of the six-story tenement house at 297 Avenue B, occupied by one John Horay, and while therein did, in concert with said John Horay and two other unknown men, feloniously obtain from one John Krondrachuiçk of 49 Avenue B, who was present, the sum of $304. This during his tour of reserve duty, from 2 to 8 p. m., May 14, 1911, at the seventeenth precinct station house."

The witness Ivan Kodreduk, being the party referred to in the specifications against the relator, testified that he was taken by two Russian friends to the house in question for the purpose of obtaining work from some unnamed union, when he met a man calling himself a "foreman," who dropped some bills on the floor, and who, when he picked them up, claimed that a $20 bill was missing therefrom. A demand was then made that all the parties present be searched, when the person referred to as the "superintendent" agreed to be searched first. After considerable discussion a demand was made that the witness be searched, to which he refused to consent, whereupon the "superintendent" went out to get a police officer, and returned with one in about an hour or hour and a half, who promptly demanded what the trouble was, and demanded that the witness show him the money he had in his possession, which, becoming alarmed, he finally did, handing it to the officer in the shape of a roll containing $305. The officer then turned this money over to the "superintendent," who returned it after

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a minute or so to the officer, who put it in the witness' pocket and told him to count it at the station house, where he was going to take him. The witness was then pulled downstairs, as he says, and after being taken around the block, was returned to the house in question, and when the officer went upstairs the witness put his hand in his pocket and found that his roll of bills had been changed to a roll of newspaper surrounded by a $1 bill. The witness was a Russian, who spoke no English. He had come from the West only the day before this experience. For some time he endeavored to get redress, and was finally referred by a lawyer to a police court, whence he claims to have been sent to a station house, where his complaint was taken by detectives. The witness had mistaken the number of the house, and had given "298," when in reality it was "297," which delayed the investigation of the facts for a day, but he finally got the correct number of the house where he had been swindled, and going there found Horay, whose arrest he obtained on Sunday, the 21st. While in court on that day, testifying against Horay, he made the first mention of any policeman in connection with the crime against him, this being a week after the occurrences in question. He says he did not remember to say anything about the policeman earlier. Upon Horay's examination, the witness gave the number of the policeman's helmet as 3370. As a result thereof, the relator, whose helmet bore that number, was directed to report in the twelfth precinct station house, and there, attired in full uniform and wearing his helmet bearing the number which Kodreduk had already testified to be the one displayed by the policeman who was a party to the offense, stood in line with other patrolmen, and was identified as the person who had been present at the time of the occurrences in Horay's house. Kodreduk claimed to have recognized Huntington by his face, not by his number. The witness was positive in fixing the time when the officer was present and took his money, as has been described, as being after 2 o'clock, and between 3 and 4 o'clock, or after 4 o'clock, but his impression seems to have been that it was between 3 and 4, and that is a fair construction to be given to his entire testimony on the subject.

As against this testimony the relator has produced witnesses, upon whose credibility no attack has been made, and who must be deemed to have deliberately perjured themselves, before the findings of the commissioner can be sustained. It is established by the testimony of Captain McDermott, a witness for the complainant, that the relator, who is a tall man, and one of the largest in the seventeenth precinct station house, answered the roll call on the evening of May 14th, at 8 p. m. It is established by the testimony of Lieutenant Robert E. Mills of the same precinct, also a witness for the complainant, that the relator answered reserve roll call at 2 p. m. on the same day. The testimony of these two witnesses demonstrates the practical impossibility of any officer leaving the station house in question without being seen by the lieutenant in charge at the desk. Huntington was not seen leaving the station house between the hours of 2 and 8 p. m. Not only that, but it affirmatively appears that he was seen, between the hours in question, by fellow officers in the seventeenth precinct station house,

and his presence therein is accounted for during the entire time of the perpetration of the fraud upon the complainant. Thus Sergeant George H. Merritt saw the relator between 3 and 3:30 by the bootblack chair as the witness passed into the toilet, and heard him joking with Officer Byrne and others regarding some event in connection with the Police Parade, which had occurred the day preceding. He did not see him go out until he went to supper. Officer Paul J. Byrne was at the bootblack chair with relator when Sergeant Merritt passed, and they went upstairs to the dormitory to bed between 3:15 and 3:20. When they arrived in the dormitory Officers Sauer and Haggerty were there, the latter being asleep; also an officer named Murphy. This witness saw Huntington undress and go to bed. Officer William M. Conklin went to supper with the relator about 7 o'clock; he had last seen him about half past 2. Officer Max Labell saw Huntington by the bootblack chair, and saw him going upstairs to the dormitory between 3 and 3:30 p. m. Officer James D. Haggerty saw the relator after the roll call at 2 o'clock, and arose from bed at the same time as he did, at about 6:30, to go out to supper. He saw Huntington dressing at the same time as he did. Officer Charles A. Sauer saw the relator in conversation with Officers Slattery and Byrne by the bootblack stand; saw him retire to his bed at about 3:30 p. m., and saw him arise and dressing at 6:30 p. m., when he had just arisen from his bed. He saw Huntington and the others retire at about 3:30 p. m., at the same time that he did. Officer Michael F. Slattery saw relator at reserve roll call at 2 p. m., and at the bootblack stand at about 3. He also saw relator going to bed after 3 o'clock. Officer William P. Hogan testified that the cellar door, to which there was some suggestion that the relator in some undisclosed manner might have managed to pass, after having found his way thereto unperceived, was locked, and that when he went, on the evening of May 14th, to put out the ash cans, the key to this door had to be obtained from behind the lieutenant's desk, where it was kept. George Schulties, Antone Maximozich, and Francesca Maximozich swore that no police officer whatever was present while the complainant was with Horay, at which time they also claim to have been present. The relator absolutely denied his presence at the scene of the crime, and his testimony as to his whereabouts on the afternoon of the day in question in all respects coincided with that of the witnesses produced on his behalf.

While disposed to rely in the fullest degree upon the judgment of the commissioner in determining the weight to be given to conflicting testimony, we are of the opinion that the preponderance of evidence is overwhelmingly in favor of relator herein, and that he has satisfactorily demonstrated that he was in the station house at the time of the occurrences complained of, and was nowhere near the scene of their commission. No one seems to have called at the station house to see him, or with any letter for him, nor did he receive any telephone calls, and there is no suggestion as to how he could have obtained the message inviting him to play his part in the robbery of the complainant. The complainant's own story shows that if any one dressed in police uniform came into the premises in which he was detained, that person

had been brought there for the very purpose of assisting in the successful completion of the swindle upon him. Whoever that person may have been, we are well convinced upon the record that it was not the relator, who was then either about to retire or actually in bed in the station house, where he was entitled to be on his reserve duty.

It follows, therefore, that the writ should be sustained and the proceedings annulled, and the relator reinstated to his position in the police department, with costs and disbursements. All concur.